**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| A.M. by and through next friend,<br>NAKALA MURRY, NAKALA MURRY,<br><br>*Plaintiffs*,<br><br>v.<br><br>CITY OF INDIANOLA, OFFICER<br>GREGORY CAPERS,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 4:25-cv-53-DMB-DAS |

## COMPLAINT

Plaintiffs A.M. (by and through next friend Nakala Murry) and Nakala Murry, by and through their attorneys, for their Complaint against Defendants City of Indianola and Officer Gregory Capers state as follows:

## INTRODUCTION

1. On May 20, 2023, Indianola Police Officer Gregory Capers used unreasonable deadly force when he shot eleven-year-old A.M. in the chest despite the fact that A.M. was unarmed, had his hands raised in the air, and did not pose a threat to Capers or anyone else.

2. Prior to the shooting, Nakala Murry (A.M.'s mother) requested police assistance because her former partner entered her home without permission while her children and her niece and nephew were sleeping. The children at the home, including A.M., faced no danger from Ms. Murry's former partner. But when her former partner refused to leave, Ms. Murry stealthily communicated to her son A.M. and asked him to contact the Indianola Police Department (IPD).

3. Upon being dispatched to the scene, Defendant Capers handled the entire encounter with escalatory violence. He treated Ms. Murry as if she were a suspect and

brandished his firearm inches from her face. After Ms. Murry was safely outside of the home, Capers commanded the occupants of the home to come out. A.M. complied with these commands and entered the living room with his hands up. In response, Defendant Capers shot A.M. in the chest. Defendant Capers' intentional use of deadly force was objectively unreasonable. Additionally, Defendant Capers' unreasonable use of deadly force was caused by failures in IPD's policies and training.

## PARTIES

4. Plaintiff Nakala Murry is the mother of A.M., who Defendant Capers shot on May 20, 2023. Ms. Murry and her son, Plaintiff A.M., are residents of the city of Indianola, in Sunflower County, Mississippi.

5. Defendant Officer Gergory Capers is a City of Indianola employee with the IPD. At all times relevant to the events at issue in this case, Defendant Capers was acting under color of law and within the scope of his employment with the IPD. Defendant Capers is sued in his individual capacity.

6. Defendant City of Indianola is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Mississippi. It is authorized under the statutes of the State of Mississippi to maintain the Indianola Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible. Defendant City was, at all times material to this Complaint, the employer and principal of Defendant Capers.

## JURISDICTION AND VENUE

7. This action is being brough pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(3) and 42 U.S.C. §1983.

8. Venue is proper in the Northern District of Mississippi, pursuant to 28 U.S.C. §1391, because a substantial part of the events and omissions giving rise to this claim occurred in this judicial district.

## FACTS

### Defendant Capers Knew the Williams-Murry Family Well and Knew that A.M. Was a Kind and Gentle Child

9. Defendant Capers was well-acquainted with the Williams-Murry family. He knew that Ms. Murry lived with two children, A.M. and his younger sister.

10. Defendant Capers knew A.M. and interacted with him frequently at the store across the street from the family's house. Defendant Capers observed A.M. interacting with his younger sibling and cousins on multiple occasions and knew that A.M. is and was a kind child who is and was protective of his family.

11. Defendant Capers never had any reason to suspect A.M. as capable of any violence or act of aggression—particularly not targeted at law enforcement or against his own mother.

12. Defendant Capers had no specific prior knowledge suggesting that any former partner of Ms. Murry had used a weapon against Ms. Murry or anyone else.

### The Family's Calls Requesting Police Assistance and Communications with Dispatch

13. Sometime between 3:00 and 4:00 am on May 20, 2023, Ms. Murry's former partner, who was the father of one of her children, entered her home without her consent. Ms. Murry needed police assistance because he refused to leave. At no time did he physically harm Ms. Murry during this interaction.

14. Ms. Murry kept her former partner talking on the couch in her living room hopeful that police would come and escort him out of her home.

15. Ms. Murry told her son, A.M., to contact his grandmother. Ms. Murry knew that her mother would call the police and get her help. A.M. made the call to his grandmother.

16. On May 20, 2023, at 4:33 am, Ms. Murry's mother called the police and requested that police go to Ms. Murry's house. She explained to the dispatcher that her grandson, A.M., had to sneak and call her.

17. The dispatcher heard Ms. Murry's mother state that her grandson relayed the need for police protection.

18. A few minutes later, at 4:37 am, A.M. called 911 and requested police help. Dispatch informed A.M. that police were enroute to his house and that someone had already called dispatch requesting help for the family.

19. When Defendant Capers arrived at Ms. Murry's home, he requested that dispatch contact A.M. and ask whether Defendant Capers had permission to kick down the front door and whether there were any weapons involved.

20. The dispatcher spoke with A.M. again at 4:45 am. During this call A.M. explained that his mother's former partner would not allow his mother to open the door. A.M. granted Defendant Capers permission to kick down the front door to his home. In response to the dispatcher's questions about whether there were weapons involved, A.M. stated, "No. I don't think so."

21. The dispatcher contacted Defendant Capers and told Capers that A.M. did not believe there were any weapons involved.

**Defendant Capers Arrives at the Family's Home Unreasonably Brandishing His Weapon**

22. At or around 4:45 am, Ms. Murry and her former partner were in the living room of her home. He continued his refusals to leave, but he was not physically harming Ms. Murry.

23. As Defendant Capers arrived at the family's home, he unholstered his firearm and proceeded to bang on the door repeatedly.

24. In response to Defendant Capers banging on the door, Ms. Murry's former partner left the living room and went to the back of the house.

25. After a few seconds, Defendant Capers stopped banging on the door.

26. The dispatcher then told Defendant Capers that, to the knowledge of the occupants, there were no weapons involved, and that Capers had permission to kick the door in.

27. In response to the latest dispatch, Defendant Capers began "mule kicking" the door repeatedly with his unholstered firearm in one hand.

28. The front door opened up to the living room where Ms. Murry was seated.

29. Within seconds after Defendant Capers began kicking the door, Ms. Murry appeared at the door.

30. She appeared uninjured and her former partner was not in sight.

31. Despite the fact that dispatch informed Defendant Capers that Ms. Murry was the victim, and despite the fact that Ms. Murry was well known to Defendant Capers, Defendant Capers pointed his gun at her and screamed "let me see your hands, let me see your hands!"

32. Defendant Capers kept his firearm pointed inches from Ms. Murry's face after it was clear that she was no threat to anyone and after he confirmed that she was the victim in this situation.

33. Defendant Capers ordered Ms. Murry out of the house.

34. As she exited the house, Defendant Capers asked her "does he have any weapons?" Ms. Murry answered no.

35. In response to Defendant Capers' question, "where is he at" Ms. Murry gestured to communicate that her former partner was still in the home.

36. Defendant Capers unreasonably seized Ms. Murry by pointing his gun at her, ordering her to exit the home and remain there, and preventing her from reaching and protecting A.M. from Capers' unreasonable use of force.

37. Ms. Murry suffered damages including violations of her constitutional rights, suffering, extreme mental distress, anguish, humiliation, and fear as a result of Defendant Capers' unreasonable seizure and unreasonable use of force against her.

**Defendant Capers' Knowledge Prior to the Moment He Stepped Inside of the Family Home**

38. Defendant Capers did not know the name of the person in Ms. Murry's house. He therefore had no knowledge about this person's criminal background.

39. Defendant Capers did know that Ms. Murry had a former partner with whom she had prior contact that required police involvement. Capers knew that the former partner was 6'3 inches tall.

40. Defendant Capers knew that Ms. Murry appeared uninjured and was able to walk out of the home into the yard without assistance.

41. Defendant Capers knew that there were no weapons involved in this incident.

42. Defendant Capers received no information from either dispatch or Ms. Murry to suggest that this situation would warrant deadly force against anyone.

43. Defendant Capers received no information from either dispatch or Ms. Murry to suggest that he or the other responding officers faced a heightened threat in responding to the incident.

44. Defendant Capers knew that there was a substantial likelihood that Ms. Murry's young children were at the home at 5:00 am on a Saturday night.

**Defendant Capers Enters the Family Home and Shoots A.M. in the Chest**

45. Defendant Capers entered the family's home using tactics that were unreasonably escalatory.

46. Capers screamed into the home "come on out, come out sir, don't make us come in!"

47. Defendant Capers then asked Ms. Murry "where's he at?" She responded tearfully "I was trying to tell you, you told me to move."

48. Defendant Capers did not ask Ms. Murry any further questions about who else was in the home or the location of her former partner.

49. Defendant Capers entered the home. Subsequently, A.M. came into the living room with his hands raised.

50. The average eleven-year-old in the United States is 4'10 inches tall.

51. At the time of the incident, A.M. was slightly shorter than average, standing at 4'9".

52. No reasonable police officer could have mistaken A.M. for a grown man capable of harming Ms. Murry, Defendant Capers, or the other responding officers.

53. At the moment he entered the home, Defendant Capers had no information to suggest that this situation would require the use of deadly force.

54. A.M. entered the living room of the home with his hands raised.

55. A.M. was unarmed when he entered the living room of the home.

56. A.M. did not have anything in his hands that could have been misconstrued as a weapon.

57. A.M. did not say anything threatening toward Defendant Capers as he entered the living room with his hands raised.

58. A.M. was complying with Defendant Capers' commands as he entered the room with his hands raised.

59. Even though A.M. did not pose any threat of death or bodily harm to Defendant Capers or anyone else, Defendant Capers intentionally fired his gun directly at A.M. once, directly in his chest.

60. At the time he fired his gun, Defendant Capers aimed and shot directly at A.M.

61. Defendant Capers intentionally used deadly force against A.M. Defendant Capers was not aiming for Ms. Murry's former partner and then inadvertently hit A.M.

62. At the moment he fired his gun, Defendant Capers could see that A.M. had his hands raised.

63. At the moment he fired his gun, Defendant Capers could see that A.M. did not have anything in his hands.

64. At the moment he fired his gun, Defendant Capers knew that A.M. was complying with his commands.

65. At the moment Defendant Capers fired his gun, A.M. was at least 8 feet away from him.

66. Defendant Capers had the opportunity to give an appropriate warning to A.M. and the other occupants of the house, such as a warning that he was armed and prepared to shoot, but Defendant Capers never gave any such warning before shooting A.M.

67. As a result of Defendant Capers' use of deadly force A.M. sustained major injuries, including suffering from a collapsed lung, lacerated liver, and fractured ribs.

68. Despite Defendant Capers' unreasonable use of deadly force, A.M. survived. He lives with the symptoms of post-traumatic stress disorder, including hypervigilance, fear, and anxiety. He also has bullet fragments in his body that put him at a lifetime risk of lead poisoning, migration to the airways, and other related health complications.

**Defendant Capers' Admissions During the Post Shooting Investigation**

69. After Defendant Capers' unreasonable use of deadly force against A.M., the Mississippi Bureau of Investigations conducted an investigation into the shooting.

70. During the investigation, Defendant Capers admitted that he knew children lived at Ms. Murry's family home. He stated that Ms. Murry's children were frequently at the neighborhood store he patrolled and that he was previously acquainted with A.M.

71. Defendant Capers confirmed that A.M. was not holding anything in his hands that could have been mistaken as a weapon at the time he shot A.M.

72. Defendant Capers stated that he had previously arrested Ms. Murry's former partner—who is 6'3" and 190 pounds—on a domestic violence charge.

73. A.M. was a foot and a half shorter and fifty pounds lighter than Ms. Murry's former partner.

**The Indianola Police Department's Policies and Procedures are Constitutionally Deficient**

74. The International Association of Chiefs of Police (IACP) is "the world's largest and most influential professional association for police leaders."

75. The IACP model policy regarding police response to domestic violence contains a number of critically important provisions, all of which are absent from Indianola's policies. For example, the IACP requires that police departments:

a. **Identify the presence of children.** Immediately upon receiving a call alleging domestic violence, police must determine if children are in the home. On May 20, 2023, dispatch spoke to A.M. twice and his grandmother once. The City of Indianola, in accordance with its insufficient policies, failed to appropriately address the presence of children at Ms. Murry's home.

b. **Keep the caller on the line. "**Whenever possible and when it will not jeopardize the individual's safety, keep the caller on the line in order to relay ongoing information to the responding officer(s)." On May 20, 2023, Indianola officials failed to keep A.M. on the phone so that they could relay information to the responding officers. Instead, dispatch hurriedly disconnected the call from A.M., telling him that officers were "en route" and then disconnecting.

c. **Engage in a de-escalatory manner.** The IACP model policy provides a number of recommendations regarding how officers should approach domestic violence locations in a low-key, non-escalatory manner. On May 20, 2023, Defendant Capers escalated the situation through a number of tactical decisions, after Ms. Murry was clearly safe and out of the house, including screaming commands and continued gun pointing.

76. The Police Executive Research Forum provides the model below to explain how officers should make decisions during a critical incident. Indianola Police policies provide no

such guidance, and Defendant Capers entirely failed to collect relevant information, accurately assess relevant threats, and act, review, and reassess.




77. The National Consensus Policy on Use of Force (NCPUF) is a collaborative effort among 11 of the most significant law enforcement leadership and labor organizations in the United States. The policy reflects the best thinking of all consensus organizations and is intended to serve as a template for law enforcement agencies to compare and enhance their existing policies. The NCPUF represents national best practice regarding officer use of force.

78. The Indianola Police Department Use of Force Policy contains a number of provisions that directly conflict with the NCPUF.

79. The NCPUF provides that “[a]n officer shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force.”

80. In contrast the IPD policies direct that “officers will maintain a constant readiness and ability to act in instances where in their perception, the Use of Force whether it be deadly or less lethal force may be appropriate. By maintaining readiness and capacity officers reduce the likelihood of opposition and the actual need for a forceful response of any kind.”

81. The NCPUF states that "[t]aking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary. De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and tactical repositioning."

82. IPD policy provides no specific instructions regarding de-escalation.

83. The NCPUF provides that "[w]here feasible, the officer shall identify himself or herself as a law enforcement officer and warn of his or her intent to use deadly force."

84. The IPD policy contains no provisions requiring that officers provide a warning prior to the use of lethal force.

85. The IPD policy further misstates the law and provides that officers are permitted to use deadly force merely because they perceive a suspect to be assaultive and to pose a threat of serious injury and/or death. This is not the law. The U.S. Supreme Court instructs that in an excessive force context "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them. . ." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

86. The omission of the objectively reasonable standard from IPD use of force policies renders the policies per se unconstitutional.

87. Given that the IPD policies are deficient as described in detail above, upon information and belief, its officer training also fails to comply with constitutional requirements and professionally accepted standards.

## LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth Amendment

88. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

89. Count I is alleged against Defendant Capers.

90. Defendant Capers used unreasonable and excessive force, without legal cause, against A.M. in violation of A.M.'s rights under the Fourth Amendment of the United States Constitution.

91. Defendant Capers detained Plaintiff Nakala Murry without probable cause during the above-described incident, in violation of her rights under the Fourth Amendment of the United States Constitution.

92. Defendant Capers used unreasonable and excessive force against Ms. Murry during the above-described incident by pointing his firearm at her and brandishing his firearm inches from her face, in violation of her rights under the Fourth Amendment of the United States Constitution.

93. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with disregard for Plaintiffs' clearly established constitutional rights.

94. Defendant Capers' actions were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, extreme mental distress, anguish, humiliation, and fear as set forth more fully above.

### COUNT II – 42 U.S.C. § 1983
### Unlawful Policy and Practice

95. Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

96. Count II is alleged against Defendant City of Indianola.

97. Defendant Capers acted under the color of law, and under the authority of one or more interrelated policies of the IPD, to violate Plaintiffs' rights as set forth in the preceding claims.

98. The City of Indianola, through its Police Department, has interrelated policies, practices, and customs which included, inter alia, unconstitutional use of force and related policies.

99. The City has implemented, enforced, encouraged, and sanctioned IPD's policies, alleged above in violation of A.M.'s Fourth Amendment rights.

100. The City has acted with deliberate indifference to Plaintiffs' Fourth Amendment rights. As a direct and proximate result of the acts and omissions of the City and IPD, Plaintiffs' Fourth Amendment rights have been violated.

101. The policies of the IPD were the direct and proximate cause of the violations of Plaintiffs' constitutional rights and the damages they suffered, including bodily injury, pain and suffering, extreme mental distress, anguish, and fear as set forth more fully above.

## JURY DEMAND

Under Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all claims so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment in their favor against the Defendants in the following manner:

1. Award Plaintiffs compensatory and punitive damages.
2. Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

3. Award Plaintiffs such other and further relief as this Court may deem appropriate and just.

Respectfully submitted,

s/ Sheila A. Bedi

Sheila A. Bedi MS. Bar # 101652
Wallace Hilke*
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611-3609
312-503-8576

Ben H. Elson*
G. Flint Taylor*
Nora Snyder*
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
773-235-0070

Counsel for Plaintiffs

*pro hac vice motions pending/forthcoming