CERTIFIED
COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

| | |
|---|---|
| A.M. by and through next friend, NAKALA MURRY, and NAKALA MURRY, Plaintiffs, v. CITY OF INDIANOLA, MISSISSIPPI, and OFFICER GREG CAPERS, Defendants. | No. 4:25-cv-53-JDM-DAS |

MISSISSIPPI DEPARTMENT OF PUBLIC SAFETY, ATTN
MISSISSIPPI BUREAU OF INVESTIGATION
30(b)(6) DEPOSITION OF BRADLEY SANDERS

7:00 a.m.
April 14, 2026

STENO
File #2581460

Reported By: Judy Robinson, CCR #2171

A P P E A R A N C E S

ATTORNEYS APPEARING FOR PLAINTIFFS:

WALLACE HILKE
ELIANA GREEN
COMMUNITY JUSTICE AND CIVIL RIGHTS CLINIC
AT NORTHWESTERN LAW SCHOOL
375 East Chicago Avenue
Chicago, Illinois 60611
651.329.3224
wally.hilke@law.northwestern.edu

ATTORNEYS APPEARING FOR THE DEFENDANT SARGENT GREGORY CAPERS:

BRADY KEETON
CARR LAW FIRM
301 West Sunflower Road, Suite D
Cleveland, Mississippi 38732
662.441.1529
bkeeton@carrlawpllc.com

ATTORNEYS APPEARING FOR THE INDIANOLA MISSISSIPPI AND GREGORY CAPERS:

MCKENZIE PRICE
DANNY GRIFFITH
JACKS GRIFFITH LUCIANO
150 North Sharp Avenue
Cleveland, Mississippi 38732
662.843.6171
mprice@glpalaw.com
dgriffith@glpalaw.com

Also Present: Kwasi Yeboah, Videographer;
Spencer Cash, Local Counsel for Plaintiff;
Graham Carner, Local Counsel for Plaintiff

I N D E X


| WITNESS | EXAMINATION | PAGES |
|---|---|---|
| BRADLEY SANDERS | | |
| | BY MR. HILKE | 5-64 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Subpoena | 10 |
| Exhibit 2 | Case File | 30 |
| Exhibit 3 | Case File No. 2 ES2972 | 31 |
| Exhibit 4 | Report, DEF3148, June 28, 2023 | 43 |
| Exhibit 5 | Report DEF3106-DEF3109, May 20, 2024 | 52 |
| Exhibit 6 | Email dated June 8, 2023 and Text Messages dated December 12, 2023 | 59 |

BE IT REMEMBERED that the deposition upon oral examination of BRADLEY SANDERS was taken on April 14, 2026, at 7:00 a.m., at 125 South 309th Street, Federal Way, Washington, 98003, before Judith A. Robinson, CCR, Notary Public in and for the State of Washington, residing at Federal Way, Washington.

Whereupon, the following proceedings were had, to-wit:

* * * * * *

BRADLEY SANDERS
having been first duly sworn
on oath was examined
and testified as follows:

E X A M I N A T I O N

BY MR. HILKE:

Q. Good morning, Mr. Sanders. Can you hear me okay?

A. Yes.

Q. Sir, I -- my name's Wally Hilke. I'm one of the lawyers for plaintiffs, Nakala Murry and [redacted] Would you please start by stating and spelling your full name for the record today?

A. Bradley C. Sanders. B-R-A-D-L-E-Y, C, and Sanders, S-A-N-D-E-R-S.

Q. Okay. May the record reflect this is a

deposition of 30(b)(6) witness, Bradley Sanders, taken in Murry v. Indianola pending in the Northern District of Mississippi.

Sir, have you ever been deposed before?

A. Yes.

Q. All right. This may be familiar with you. But I'm just going to start with a couple of reminders. We've got a court reporter making a record, so we'll have to speak one at time, and we -- she can only take down verbal answers, not gestures, not uh-huhs or things like that. Fair enough?

A. Yes.

Q. I want to make sure you understand all my questions today. Make sure we have a good connection. Make sure my questions are clear. If at any time you don't understand my question or you didn't hear it, please ask me to repeat it or rephrase it, okay?

A. Yes.

Q. I'm going to try to be efficient but we can take as many breaks as you need to. If I have a question pending, I'll just ask that you answer it before we go on break. Fair enough?

A. Yes.

Q. All right. Is there any reason that you can't give accurate testimony today?

A. I will give accurate testimony.

Q. Okay. And no -- wonderful. And can you tell me, sir, what you did to prepare for the deposition today?

A. Well, I talked to you about it. Talked with legal. And I reviewed the file.

Q. And when you said you reviewed the file, what specifically did you review?

A. Well, my case file that I turned over to the Attorney General's Office.

Q. All right. Is that a physical or an electronic case file?

A. I mean, it could be either or. I mean what I looked at --

Q. Yes.

A. -- was on the computer electronic, yes.

Q. Okay. And what you looked at was the same documents you turned over in response to the subpoena that the department got?

A. Legal turned the stuff over to you, the subpoena, not me.

Q. Understood. Okay. And did you -- were there any particular documents you looked at as you got ready for the deposition?

A. No, just over -- I reviewed it, just to try to

answer your questions.

Q. And did you watch any video to get ready for the deposition?

A. I did not.

Q. And did you listen to any audio to get ready for the deposition?

A. I did not.

Q. And I know I observed that there is not an attorney representing you at this deposition today. Are you okay proceeding without an attorney representing you today?

A. Yeah. DPS failed to provide the attorney from the Attorney General's Office. So that's upon them.

Q. Okay.

A. But I'm comfortable.

Q. Sure. Do you need us to wait so you can contact anyone or ask any questions about that before we proceed?

A. No. For the record, I did try to contact the lawyer and he did not answer the phone call.

Q. Okay. If at any time you need to contact them, if they're getting in contact with you or you want us to wait, just let me know and we'll stop right away, okay?

A. Okay.

Q. My one last note is you may hear counsel for the defendants object at some point. You may hear me object later when they ask questions. You should still go ahead and answer the question unless you're explicitly instructed to wait to answer. Fair enough?

A. Okay.

Q. All right. Just by way of background, sir, are you currently employed by the Mississippi Bureau of Investigations?

A. I am.

Q. And what is your position or rank within the bureau?

A. I'm a master sergeant, a special agent.

Q. And in general, what are your responsibilities as a master sergeant?

A. Well, within MBI, I mean, respond to calls, we work various calls. We have local jurisdictions if they request us. We work all officer-involved shootings as well.

Q. How long have you been with Mississippi Bureau of Investigations?

A. Almost four years.

Q. And have you participated in the investigation of officer-involved shootings during your time with the MBI?

A. Yes.

Q. How many officer-involved shootings have you participated in investigating, approximately?

A. Five.

Q. And when you participate in officer-involved shootings, is there investigations? Is there a specific role that you play?

A. No. Sometimes you're the lead agent, sometimes you're not, so you're there to assist.

Q. And in terms of the lead agent's role, what is the lead agent's role in an MBI officer-involved shooting investigation?

A. Well, lead agent, you're over everything. You make sure everything's being done. You assign tasks to other agents. Then it's your responsibility to make sure everything is done properly and then put it together and submit it to the Attorney General's Office.

Q. And in terms of the supporting agent or investigators, what are the roles of the other agents, I guess, the non lead agents in an officer-involved shooting investigation?

A. No, that's not what they say. They can't say one specific thing. It's just to help with the investigation overall. Each investigation, each agent will do something different, you know, every time.

Q. And they -- am I correct they act at the direction of the lead agent on the investigation?

A. That's correct.

Q. Sir, did you bring any documents with you to the deposition today?

A. I did not.

Q. All right. Sir, I'm going to mark Exhibit 1, and if you need me -- if we need to reset so you have -- so you can view my exhibits accurately, let me know and we'll take the time to do that. I'm going to share my screen now.

This is Exhibit 1. This is a four-page document that is a subpoena to testify at a deposition in a civil action. Are you able to see this document on your screen?

(Exhibit No. 1 as marked.)

A. I am.

BY MR. HILKE:

Q. Is this the -- and I'll scroll down to page 4 of the document. Here there's a document that says "30(b)(6) -- Rider 30(b)(6)subpoena." Do you see that on your screen?

A. I do.

Q. Did you receive this document?

A. From via e-mail, yes.

Q. Okay. And are you -- have you been designated to provide testimony on the topics in this 30(b)(6) subpoena Rider?

A. Yes.

Q. Topic number 1 reads "The Mississippi Bureau of Investigation, MBI investigation into the shooting of [redacted] by Indianola Police Department Agent Greg Carpers on May 20, 2023, including but not limited to the actions taken during the investigation, the interviews conducted during the investigation, the conclusions, if any, reached during the investigation. The referral of the investigation for prosecution and any subsequent steps taken relative to the investigation, and whether the MBI conducted any internal affairs, administrative or compliance investigations regarding the shooting." Did I read that correctly?

A. It appears so.

Q. All right. Are you prepared to testify on this topic?

A. Yes.

Q. And have you reviewed the case file in order to prepare to testify on this topic?

A. Yes.

Q. And were you the lead -- were you personally

involved in the officer-involved shooting investigation that's described here?

A. Yes.

Q. What was your role in that investigation?

A. I was the lead investigator.

Q. Okay. So you have -- do you have personal knowledge from communicating with the other investigators as they worked with you to conduct this investigation?

A. Yes.

Q. Are there any documents, communications or materials that you wanted to review or would have needed to review to prepare to testify on this topic but were not able to review?

A. Not that I'm aware of.

Q. All right. Topic number 2 is "The communications between the MBI, the City of Indianola and the Indianola Police Department regarding the shooting of [redacted] by Indianola Police Department Agent Greg Capers on May 20, 2023, and any subsequent investigations regarding the shooting. Including, (a.), requests for information and documents by the MBI, and how and whether those requests were fulfilled.

And (b.), communications regarding the status

completion and results of the investigation including whether the MBI ever communicated that Capers had been cleared or exonerated by the investigation." Did I read that correctly?

A. It appears to be.

Q. Okay. Do you need to be able to see these documents bigger so you can look at them while I'm discussing them with you at this deposition?

A. No, I think I'm good.

Q. All right. Please let me know at any time if you do and we can make that happen. Are you prepared to testify on topic number 2, including subtopics (a) and (b)?

A. I'm prepared to give this deposition.

Q. All right. Is there any -- did you gather information in reviewing the case file so -- to prepare you to testify on this topic?

A. As I stated earlier, I reviewed the case file.

Q. Is there any information that you know exists or wanted to gather but didn't have time to that you need to review to prepare to testify for this -- these -- this topic of the deposition?

A. Not that I'm aware of.

Q. All right. Okay.

I'm going to call your attention to page 1 of

Exhibit 1, where it describes production. And the subpoena orders you to bring with you to the deposition all documents, communications, and other records related to the investigation into the shooting of [redacted] by Indianola Police Department Officer Greg Capers on May 2023. And I understand -- if I understand your testimony, there is an electronic case file, and your understanding is that that's been produced to us already; is that correct?

A. Yes.

Q. In terms of the communications related to the investigation, do you know if there's been any search conducted for text messages pertaining to the shooting investigation?

A. Text messages from who?

Q. From any of the agents who participated in the investigation?

A. Well, I'm not aware of searching for text messages.

Q. Okay. Do MBI agents retain text messages they send and receive relative to an officer-involved shooting investigation?

A. If it's relevant to the case, they would. If it's -- it would be turned over with the file. On this case I don't believe there was anything turned over for

text messages.

Q. Okay. And do you know whether the agents were ever asked if they had text messages relevant to the investigation?

A. No.

Q. And in terms of e-mails, do you know whether agents' e-mails were searched relative to the investigation?

A. No.

Q. Okay. And do you know whether agents were ever asked to produce any e-mails they had relevant to the investigation?

A. They were not specifically asked about e-mails, no.

Q. Okay. And who would have access to the text messages from the agents if there are any relevant to the investigation?

A. There would be no text messages relevant to the criminal investigation that we conducted from the agents.

Q. My question's a little different. Agents that -- text messages of the agents sent or received, who would have access to them? Is it just each agent has access to their own phone or are they stored centrally in some way?

A. No. They would have their own phone.

Q. Okay. And same question for e-mail. Does someone at MBI have access to all the officers' e-mails or do they need to search their own e-mails if there -- if something is being searched for there?

A. They would have to search their own e-mails.

Q. Okay.

A. That's my understanding.

Q. All right. Okay. So let me shift gears for a minute. And I want to ask you in general about how an MBI investigation into an officer-involved shooting is conducted. Let me start with this question. And the time period I'm concerned about is May 2023 and around that period which is when the officer-involved shooting and the subsequent investigation in our case took place. Does all that make sense?

A. Yes.

Q. Okay. So does Mississippi Bureau of Investigation have specific responsibilities when an officer-involved shooting occurs in the State of Mississippi?

A. Yes. We are to conduct the investigation.

Q. Okay. And what kind of investigation does the MBI conduct in the officer-involved shootings?

A. A criminal investigation.

Q. And what's the scope of the criminal investigation? Meaning what's the information that's being looked for?

A. Well, any -- just like any other criminal investigation, you want to find all the facts, all evidence.

Q. And what, if anything, differentiates the -- like the subject matter of a criminal investigation versus a civil investigation, an internal affairs' investigation or some other kind of investigation?

A. I don't understand your question, I guess.

Q. Thank you, sir. I guess when I say -- when you say "a criminal investigation," in a criminal investigation of an officer-involved shooting by the Mississippi Bureau of Investigation, what is ultimately done with the information uncovered in the investigation? Sort of who does it go to and what for -- for what purpose?

A. Come back. Repeat that.

Q. I'm back. I'll repeat my question. In a criminal investigation of an officer-involved shooting conducted by the Mississippi Bureau of Investigation, who ultimately receives the information that the Mississippi Bureau of Investigation gathers?

A. Once we conclude our investigation, we turn it over to the Attorney General's Office.

Q. And is that a state office, a State Attorney General's Office?

A. Yes.

Q. And what's your understanding of what the Attorney General's Office does with the information it receives?

A. Well, they have -- they shall have opportunity to present it to the grand jury.

Q. And is that the purpose of the officer-involved shooting investigation to gather the evidence to give it to the Attorney General --

A. You cut out on me again.

Q. I'm sorry, sir. Is that the purpose of the investigation to gather information to provide to the Attorney General to, if appropriate, present to the grand jury?

A. No. The purpose of the investigation is to find all the facts and evidence. And then we present it to the Attorney General who has the option to present it to the grand jury, yes.

Q. Okay. And what is the definition of an officer-involved shooting?

A. The definition of an officer-involved shooting

is when an officer discharges their weapon and someone is injured. That is when we would consider it an officer-involved shooting and we would investigate it.

Q. And then after the investigation is presented to the Attorney General, who makes the decision about whether to present the -- a case to the grand injury?

A. The Attorney General. I don't know.

Q. Does the MBI make the decision about whether to bring criminal charges against an officer?

A. No. We turn it over to the Attorney General and that's their job.

Q. And does the Mississippi Bureau of Investigations make a recommendation like this? Is part of the investigation recommending whether or not criminal charges should be brought?

A. No.

Q. Does the MBI draw any conclusions of its own -- well, strike that.

Does the MBI make any credibility determinations as to whether or not witnesses were credible during the course of the investigation?

A. We provide all details through our investigation in our case file. And it's then presented to the Attorney General. We make no conclusions.

Q. In an officer-involved shooting investigation,

does the MBI make any determinations about whether the involved officer complied with local police department policy?

A. We do not look at their policy per se. We provide their policy in order for the Attorney General's Office to have the information, but that is not what we're actually looking into. I guess that -- like I said that would be for the Attorney General's Office to determine if they wanted to.

Q. Okay. Does the Mississippi Bureau of Investigation have any responsibility for like administrative discipline of local police officers?

A. No.

Q. Does the -- is it the Mississippi Bureau of Investigation's job to determine whether an internal affairs' investigation or other disciplinary investigation should occur as to an officer who has committed an officer-involved shooting?

A. No. The MBI does not have any say in that.

Q. Does the Mississippi Bureau of Investigations prohibit local police departments from conducting their own internal affairs' investigations of officer-involved shootings once the criminal investigation has concluded?

A. No.

Q. And in the course of an officer-involved

shooting investigation, does the Mississippi Bureau of Investigations interview witnesses?

A. Yes.

Q. Do the investigators take notes of those interviews?

A. They can.

Q. Okay. And are those investigations also sometimes recorded like by audio or other means?

A. Yes. They are typically always audio recorded.

Q. And if an interview is not audio recorded for whatever reason, are investigators trained to take their own notes of the interviews?

A. They would be required to write a report, which would state what was said in the interview.

Q. Okay. Are investigators trained that if they're recording an interview by taking notes that their notes need to be accurate?

A. Say that again? Ask that question again.

Q. Are investigators trained that their notes of interviews must be accurate?

A. Their notes are their own notes. Like I said, we always -- typically always have them audio recorded. So I can say there's a policy on the notes.

Q. Okay. Am I -- was your testimony just now

that if there is no audio recording of an interview, it should be memorialized via notes?

A. I don't know if it's mandatory. I don't think it's mandatory that it is.

Q. Is that something you would expect the -- if you were the lead agent on an investigation, would you expect the investigators you're working with to take handwritten notes of interviews if they had not audio recorded them?

A. Yes. I would want to see it, yes.

Q. Okay. And are investigators aware that their notes may be used as evidence and will be presented to the Attorney General as part of the investigation?

A. Yes.

Q. Okay. So in an MBI officer-involved shooting investigation, at the start of the investigation, is there typically some communication to the police department leadership about what to expect from the investigation?

A. When we show up on scene, when they request, they tell us there's an officer-involved shooting. We show up on the scene, we speak with either the chief or assistant chief, someone in authority, and that's filed as our investigation. And that if we need them we would let them know.

Q. And why is it important to tell someone in authority that MBI is going to be in charge of the investigation?

A. It's just to make sure everybody's on the same page and there's no conflict.

Q. And is part of that -- is it important to the MBI that the local police department does not conduct their own interviews of the shooting while MBI is conducting the investigation?

A. It's important that they do not interfere with our investigation.

Q. And what kind of things can interfere with the investigation?

A. I mean, a lot of things.

Q. And are there any in particular that -- you know, that the MBI is concerned about that's why you try to have that communication at the start of the investigation?

A. Yeah. I mean, we don't really want them try to interview the officer at least for -- you know, until we are able to interview them that way we can ensure that we're getting the best information and they're not being swayed or anything by any other interviews that were taking place.

Q. And are there -- during the course of an

officer-involved shooting investigation, is it typical to provide updates or -- about the status of the investigation with the local police department?

A. If I inquire about it, we can tell them that it's either an ongoing investigation or not.

Q. Okay. And when the investigation is completed, when an officer-involved shooting investigation is completed, is there anything that's typically communicated to the involved police department?

A. Again, if I inquire about it, we can tell them that, you know, it's no longer an open investigation and then it's been turned over to the Attorney General's Office.

Q. Okay. And when the file is turned over to the Attorney General's Office at the end of the investigation, is a copy sent to the local police department?

A. No.

Q. Is there a report or a summary of the investigation that's sent to the local police department?

A. Not by MBI, no.

Q. Okay. Other than, you know, the investigation's done or the investigation's ongoing, is

there anything else that's communicated to the local police department when an investigation is completed?

A. Depends upon their questions. I mean, we do try to work with them, but they're not part of the investigation. So while the investigation is ongoing, we keep everything internally and only contact them if we need something from them.

Q. In terms of the -- and during the course of an officer-involved shooting investigation, is a physical file maintained?

A. Yes.

Q. And what goes in the physical file?

A. Same thing that goes into the file we turn over to the Attorney General's Office.

Q. And what is that? What goes in the file?

A. Our investigative findings and any evidence or, you know, paperwork of the evidence or whatnot.

Q. What is the process for investigators to write reports during the course of an investigation? Meaning, sort of, how do they write them? Who approves them? What's the reporting process during the investigation?

A. Well, the agent writes a report and we have a chain of command that it goes through in order to look at it, make sure that it's all more of coherent and no misspellings and everything. Then at the end, we sit

down and we review it again to make sure all evidence and everything is -- all reports are in the file before we submit it.

Q. Does the lead investigator review all the reports that are written in the course of an officer-involved shooting investigation?

A. Yes.

Q. And does a lead investigator -- is the lead investigator able to give feedback on the reports? For example, ask the investigator to clarify something or to provide more information?

A. Yeah. Again, it goes through a system. Like I said, when the report is -- comes through, I'm able to look at it.

Q. Okay. All right. I want to turn to asking about the officer-involved shooting investigation of the shooting of [redacted] by Greg Capers in Indianola on May 20, 2023. Could you tell me, is that an investigation that you're familiar with?

A. Yes.

Q. Could you tell me how did it start? Meaning what was the call that lead the Mississippi Bureau of Investigations to be involved?

A. They called Mississippi Bureau of Investigation, stated there was an officer-involved

shooting. I was called by my lieutenant and told where to respond.

Q. All right. And where did you first respond that morning?

A. To the address of the shooting.

Q. And what -- and do you remember about what time you arrived at the address?

A. I can't recall right off the top of my head.

Q. That's all right. And what was -- when you arrived at the address, who was at the scene?

A. I believe it was the local SO that was on the roadway site of the scene secure. We already had -- an MBI agent had been to the scene and had left the scene doing some investigation. That's all. And I think my lieutenant was there shortly after I was.

Q. Okay. And was that Chadwick Moore, the first officer on the scene?

A. Yes. First MBI agent on the scene, yes.

Q. First MBI on the scene. And was that pretty typical? Meaning the first officer on scene would, you know -- actually, sorry. Strike that.

Do you know where Mr. Moore went after he left the scene to investigate?

A. I think he went to the hospital.

Q. Was there anything that stands out to you in

your memory from being at the scene that morning when you arrived?

A. I remember the house. I remember walking into the house. It was a typical house, front door, windows. Sorry, I'm trying to get my camera set back up. There.

Like I said, it didn't appear to seem as secure by law enforcement outside.

Q. Where was the next place you went that morning?

A. What?

Q. I'm sorry.

A. What was your question?

Q. After you went to the scene, what was the next location that you traveled to that morning?

A. I was at the scene for a long time. I know after leaving that scene we went over to the gas station that was across the road. I attempted to get a footage from the gas station. If they had footage of the scene.

Q. And where did you go after the gas station?

A. I can't recall every place I went.

Q. All right. Where -- and from reviewing the file, were some officers at the Indianola Police Department that day?

A. Yes.

Q. Did they collect documents relevant to the

investigation?

A. Yes.

Q. Did you travel to the Indianola Police Department that day?

A. I did.

Q. Did you speak with anyone at the Indianola Police Department?

A. Yes, we conducted two interviews.

Q. And did you also conduct some interviews at the sheriff's office that day?

A. I believe I did, yes.

Q. Okay. And -- one moment, please.

All right. And do you remember what all the interviews you participated in that day?

A. I did interview Officer Web and Greg -- Gregory Capers and also interview -- I think those were the two interviews I did that day.

Q. And in terms of your interview with Greg Capers, was Greg Capers advised of his -- I guess his Miranda rights before he was interviewed?

A. Yes.

Q. Did he agree to proceed with the interview that day?

A. Yes.

Q. And was he able to answer your questions that

day?

A. Yes.

Q. And -- one moment, please.

MR. HILKE: I'm going to mark Exhibit 2.

(Exhibit No. 2 was marked.)

BY MR. HILKE:

Q. This was produced to us as OIS case file (1). It's Bates stamped DEF2819. It's 153 pages long. The first page reads "Case File Composition" at the front. Do you see that on your screen?

A. Yes.

Q. Are you familiar with this document?

A. Yes.

Q. What is it?

A. It's a case file composition from the case file.

Q. Now is this the case and what's included in the -- in this document? There are about like 11 different categories. Can you tell me what these 11 categories refer to as to the case file?

A. As they read. I mean, they -- just what they say, report of investigation, body, car camera, search warrants. Everything that you read that's what it says in this file.

Q. Okay. And is this a file that was presented

to the Attorney General's Office at the end the of the investigation?

A. Yes.

Q. And did the Attorney General's Office also receive the audio and video files that you had collected?

A. Yes.

Q. And then I want to refer you to --

MR. HILKE: I'll mark Exhibit 3.

(Exhibit No. 3 was marked.)

BY MR. HILKE:

Q. This was produced to us as OIS Case File 2. It's 77 pages long starting at ES2972. I just want to refer you to the end page 77, which says "Audio Interviews." Is this the remainder of the case file that was prepared in the investigation?

A. Yes, it was in the what?

Q. Is this the remainder of the case file that was prepared for the investigation?

A. What do you mean "remainder"?

Q. What I mean is there's two documents produced to us, Case File 1 and Case File 2, and I -- I'm asking if --

A. Oh, no.

Q. -- together they --

A. Okay. Yes. It's all one case file. It was just too big to send electronically as one, so...

Q. Okay. So these two documents together are the case file from the investigation?

A. That's correct.

Q. Okay. So going back to Exhibit 2, page 6 of the pdf, here we have a report drafted by Bradley Sanders, and it reads, "Summary: Under Mississippi code annotated 45-1-6, the Mississippi Bureau of Investigation(MBI) is authorized to investigate all officer-involved shootings resulting in injury or death. On May 20, 2023, Irish Johnson, a detective at Indianola Police Department, Indianola, Mississippi requested MBI assistance on an officer-involved shooting following a police response to a residential disturbance in the City of Indianola. Johnson acknowledged that MBI would be the primary agency investigating this critical incident." Did I read that correctly?

A. It appears so.

Q. And did you write this report?

A. Yes.

Q. And what's the purpose of this report?

A. To not say what happened in the very beginning, and that we were the primary agency investigating the critical incident.

Q. Let me scroll down to page 8 of the pdf. And here there's another report. It says "Drafted by Bradley Sanders," describing you responding to 1111 B.B. King Road on May 20, 2023. Do you see that?

A. Yes.

Q. And it says "Supplement Number 1" at the bottom. Can you tell me what supplement number 1 means?

A. It's stating the report. I'm trying to keep everything in order. That would be number one.

Q. Are the reports -- do you number the reports as you write them?

A. Yes. We assign numbers to them, yes.

Q. Okay. And then it says "Reviewed by Heath Farish." Who is Heath Farish on this investigation?

A. He was the lieutenant in my chain of command.

Q. Did he -- and I think you testified that -- about that a little earlier. Each report is reviewed before it's entered into the case file; is that right?

A. Correct.

Q. So let me go down to page 12. Here there is a report drafted by you that describes an interview with Gregory Capers on May 20, 2023. Do you see that in front of you?

A. Yes.

Q. And do you see that it says that you met him at the Sunflower County Sheriff's Office?

A. Yes.

Q. Does that refresh your memory as to where the interview took place?

A. Yes.

Q. And did it take place at the sheriff's office?

A. Yes.

Q. Is there any particular reason for doing the interview at the sheriff's office instead of the Indianola Police Department?

A. Yes. Because them being an officer at Indianola, we don't typically do investigations in their own precinct. We have them removed from their offices.

Q. And why is that?

A. It's a different protocol. They're not imposed by anything at their office. They're removed so we can get a good interview in.

Q. Okay. And then from your own memory of the interview with Gregory Capers, were you and the investigators able to ask all the questions that you wanted to to Mr. Cape -- to Gregory Capers during the interview?

A. Yes.

Q. And was he, you know, able to, you know, get

water, use the bathroom -- strike that.

He wasn't in custody when you interviewed him, was he?

A. That's correct.

Q. Was he free to leave at any time?

A. Yes.

Q. And did he have water -- was he offered water, bathroom, that kind of thing?

A. He wasn't denied anything if he needed anything.

Q. Okay. Other than what's written in the reports, is there anything else that stands out from your memory about the interview with Mr. Capers?

A. He was very upset about it. I know that.

Q. And was he still able to answer all the questions you posed even though he was upset?

A. Yes.

Q. So continuing to page 20 of the pdf, here we've got a report drafted by a Chadwick Moore that's one page, and it says "Supplement Number 1" at the bottom. Do you see that?

A. Yes.

Q. And so for each investigating officer, does -- did Mr. Moore start his supplements number 1, just like you started your supplements number 1?

A. Yes.

Q. Okay. And his supplement was also reviewed before it was finalized; correct?

A. It should have been, yes. I mean it was, yes.

Q. And did you also review his report before it was finalized?

A. Yes.

Q. All right. Let me scroll down to page 24. Here there's a report drafted by Chadwick Moore describing an interview with Jada Rush at the Indianola Police Department on May 20, 2023. Do you see that?

A. Yes.

Q. And it describes an interview as well as a written statement. Do you see that?

A. Yes.

Q. And it does not mention any audio recording. Did you see that when you were reviewing the case file?

A. I can't recall.

Q. Is that correct that the interview with Jada Rush on May 20, 2023 was just an interview and a written statement and not an audio recording?

A. I believe so. I believe it may have been. I didn't conduct that interview so I'm not sure.

Q. If there was an audio recording, it would have been in the case file; right?

A. Yes. It should have been, yes.

Q. I mean, do you have any reason to think that there's some audio recording that's not mentioned here that didn't end up in the case file?

A. I don't believe so. I believe everything is in the case file, yes.

Q. Okay. And is Chadwick Moore an investigator you've worked with in the past?

A. Yes.

Q. And is he a thorough officer in terms of how he conducts his investigations?

A. Yes.

Q. Are you confident that his description of interview with Jada Rush in this report is accurate?

A. Yes.

Q. Then go to pdf page 66. This is a report drafted, it says "By Bradley Sanders on October 5, 2023." Do you see that?

A. Yes.

Q. And it reads -- one moment. "I attest that all contents in this report have been cross-referenced using government and open source databases with intelligence analyst support and are attached to the case file. Items of evidentiary value have been delivered to the appropriate forensics laboratories and

are inventoried.

All persons involved have been interviewed to the best of my ability and all findings are deliverable to the Attorney General's Office. This investigation warrants no further bureau activity and is closed. The receipt of delivery to the AGO is attached to the case file." Did I read that correctly?

A. Appears so.

Q. All right. And is this standard language that would be used when closing out an officer-involved shooting investigation?

A. Yes.

Q. And what's the significance of -- and when it says "this investigation warrants no further Bureau activity," what's the significance of that statement?

A. We believe that we investigated everything that may be investigated, and was able to turn it over to the Attorney General's Office.

Q. Okay. Does that mean that it's found the evidence that -- that it's completed the investigation as to evidence that would be relevant for the, like, criminal charging decisions of the Attorney General's Office?

A. That's correct.

Q. When you wrote this report and you said this

investigation warrants no further Bureau activity, were you making any statement on -- was that drawing any conclusions as to the guilt or innocence of any person?

A. No.

Q. Let me go back to page 1 of Exhibit 2. One of the categories documents in the case file is "X Miscellaneous Documents." Do you see that?

A. Yes.

Q. And then in an officer -- in this officer-involved shooting investigation, did you compile all the information that the Indianola Police Department had provided to you during the investigation?

A. Yes.

Q. And did you then present all documents that the police department had shared with you to the Attorney General's Office?

A. Yes. That was in that case file, yes.

Q. Okay. And was it the -- was the practice that, you know, anything the department provides should be included and then the Attorney General's Office can sort out whether or not it's relevant?

A. That's correct.

Q. Okay. So the fact that a document is included in miscellaneous documents, does that mean that the MBI thought it was particularly relevant to the case?

A. Again, we try to get everything we can and we put it into the case file and we turn it over and they make the decisions.

Q. All right. Going to page 26 of the pdf, do you have -- do you see on your page a May 20, 2023 report drafted by Chadwick Moore?

A. Yes.

Q. And do you see it describes Chief Ronald Sampson, Sr. giving a copy of the dispatch log associated with domestic dispute and the IP officer-involved shooting to Mr. Moore?

A. Yes.

Q. And is that what happened in the investigation, Chief Sampson gave the dispatch log to Mr. Moore that morning?

A. Yes.

Q. And going on to the next page, page 27, do you see here another report drafted by Chadwick Moore?

A. Yes.

Q. Do you see it describes Ozie Carter with the Indianola Police Department releasing a department-issued Glock 17 to Mr. Moore?

A. Yes.

Q. Was that the weapon that Gregory Capers used when he shot [redacted]

A. Yes.

Q. And was that weapon collected during the MBI investigation?

A. Yes.

Q. Do you know what happened with the weapon at the conclusion of the investigation?

A. After the -- I don't know. No, I do not know.

Q. Okay. Going to pdf page 33, do you see here a report drafted by Chadwick Moore on June 28, 2023?

A. I see what you got pulled up, yes.

Q. Okay.

A. Yeah, I see it.

Q. And is this a report drafted by Chadwick Moore on June 28, 2023?

A. Yes.

Q. And do you see it describes Irish Johnson giving him a copy of Gregory Capers' body camera and a copy of the dictaphone for the critical incident at 1111 B.B. King Road?

A. Yes.

Q. Is that how the MBI obtained the body camera and dictaphone relevant to the investigation?

A. Yes.

Q. Scrolling up one to pdf page 32, do you see here a police report dated -- or strike that.

Do you see here on pdf page 32, a report drafted by Chadwick Moore on June 28, 2023?
A. Yes.
Q. And it describes on Saturday, May 20, 2023 at 10:52 a.m., Tana Nelson e-mailing old domestic incident calls to Mr. Moore?
A. Yes.
Q. And is that how the MBI received the old domestic incident calls referenced in this report?
A. Yes.
Q. And in terms of that e-mail from Ms. Nelson, is that an -- is that e-mail saved the same way you described before that it would be in Mr. Moore's e-mail account and he would have to search for and get it to find that e-mail?
A. Yes.
Q. All right. And do you remember -- strike that.
Did the -- on May 20, 2023, the day of the shooting, did anyone from the Indianola Police Department explain to your investigators why they were giving you old domestic incident calls?
A. We were investigating the shooting that happened and Chad would have been talking to him. And it would have just been at -- he probably asked him for

it.

Q. And do you know or are you giving your best guess?

A. No. I mean, I don't know that for sure. But for them to send it, I'm sure that he would have asked them for it.

Q. Okay. And what are your -- what's your basis for saying you're sure that he would have asked them for these reports?

A. He did not say anything that we did not ask for as far as I know.

Q. All right. Are there any other details about any conversations on May 20th regarding past domestic calls that you were -- that you are aware of?

A. I can't -- I'm not privy to all of his conversations that he had. I don't know.

Q. Would you --

MR. HILKE: Let me mark Exhibit Number 4.

(Exhibit No. 4 was marked.)

BY MR. HILKE:

Q. This is stamped DEF3148. It was part of the subpoena response that we received as well. This is a report by Chadwick Moore, drafted by Chadwick Moore with the date June 28, 2023. Do you see that on your screen?

A. Yes.

Q. Okay. And the reports reads, "On Saturday, May 20, 2023, Indianola Mayor Kenneth Featherstone and Indianola Police Department Chief Ronald Sampson, Sr. spoke to Leisure Web with the Indianola Police Department into Sampson's office and began questioning her about the officer involved shooting at 1111 B.B. King Road, Indianola, Mississippi earlier that morning.

I removed Web from the office and advised her the Mississippi Bureau of investigation, MBI, would be taking her statement involving the critical incident and to contact us if anybody else attempted to discuss the matter with her outside of legal representation if she had it. I advised Featherstone and Sampson that MBI was the primary investigating agency by law.

The critical incident was a criminal matter, MBI would conduct initial interviews, any contact they had with individuals would be hindering the investigation, and if they had any questions they could contact MBI." Did I read that correctly?

A. It appears so.

Q. And is this accurate? Is this an encounter that Mr. Moore had with Kenneth Featherstone and Ronald Sampson, Sr. on the day of the shooting?

A. I believe that's pretty accurate, yes.

Q. And in terms of the -- in terms -- when Moore

told Web to contact you if anyone else tried to talk to her about the matter other than her legal representation, what was the purpose of communicating that to Web?

A. Because we were doing an investigation, we didn't want her to be influenced by anyone else, money from her employer.

Q. And in terms of telling Featherstone and Sampson that MBI was the primary investigation agency and that any contact with the individuals would hinder the investigation, what was the purpose of that communication by Moore?

A. Again, kind of like whenever I have worked the first SR, the -- it's so that we can make sure everybody's on the same page and we don't need anyone interfering with the investigation.

Q. Okay. And this is in the subpoena file as supplement number 13, but it doesn't have a reviewed by, just has what looks like a placeholder first and last name of supervisor. Do you see that?

A. I do.

Q. And then comparing it to Exhibit 2, if we go to page 34, we can see that that's supplement number 12, whereas 35 is supplement number 14. Do you see that?

A. Yes.

Q. And so in the main case file, it goes straight from Moore's supplement number 12 to Moore's supplement number 14. Do you see that?

A. I do.

Q. And then going back to Exhibit 4 again, this report from Chadwick Moore which was in the file we received via subpoena is listed supplement number 3 -- number 13, the missing number in-between. Do you see that?

A. Yes.

Q. Is there a reason that Moore's supplement number 13 wasn't a part of the main case file?

A. It may have been in the overview or something. I don't know why it didn't get put in there.

Q. Okay. Was there any like specific problem with the report in number 13 that caused it to be excluded from the case file?

A. Not that I'm aware of.

Q. Was there any discussion in the investigation about supplement number 13 and whether or not it should be put in the case file?

A. No.

Q. Going back to Exhibit 2, I'm going to go to page -- pdf page 42 which is DEF2860. Do you see here a report by Chadwick Moore, supplement number 17?

A. Yes.

Q. And this report reads -- and I'm going to be leaving out the phone numbers because we don't need them for the record. "On Monday, May 22, 2023, I contacted the Indianola Police Department (IPD), Chief Ronald Sampson, Sr. about obtaining a copy of Gregory Capers' training record and his report for the critical incident at 1111 B.B. King Road, Indianola, Mississippi on May 20, 2023. I received Capers' training record and uploaded the file to ADSI. Sampson informed me he did not have a report from Capers about the May 20, 2023 critical incident." Did I read that correctly?

A. I believe so.

Q. Now at this time, did IPD, Sampson or anyone else give a explanation for why Capers didn't have a report about the shooting?

A. They did not to me.

Q. And is there -- did -- was Mr. Moore expected -- if there had been some explanation for why there was no report, was Mr. Moore expected to write down any relevant information in his report about this conversation?

A. Yes.

Q. Continuing on to pdf page 58, do you see here a report drafted by Chadwick Moore, supplement number

30?

A. Yes.

Q. And this report reads, "On Thursday, June 8, 2023, I spoke with Irish Johnson with the Indianola Police Department about obtaining a copy of Gregory Capers' report from the May 20, 2023 critical incident at 1111 B.B. King Road, Indianola, Mississippi when Capers shot [redacted] at address 1111 B.B. King Road, Indianola, Mississippi.

Johnson, he informed me he spoke to IPD Chief Ronald Sampson, Sr. and neither had a report nor did he acknowledge of Capers writing a report. Johnson also stated they did not have a use of force report from the May 20, 2023 incident." Did I read that correctly?

A. Appears so.

Q. And is this a report that Chad Moore wrote about his conversation with Irish Johnson?

A. Yes.

Q. And is -- are you aware of any explanation as of June 8th, 2023 given by the Indianola Police Department of why there was no report from Gregory Capers?

A. Only with the reports that Chad wrote is all I have.

Q. All right.

MR. HILKE: I'm sorry. Could the court reporter read back that last answer, please?

(Requested testimony was read.)

BY MR. HILKE:

Q. Okay. And in terms of the investigation as with the other report, was Mr. Moore expected to document whatever explanations or communications the police department had provided to him about this report?

A. I believe his report is correct. He probably would not write everything they said but his report is accurate.

Q. Okay. So then going to pdf page 60, there is -- excuse me. I'm sorry.

Going to pdf page 59, we have supplement number 31 by Chadwick Moore. Do you see that on your screen?

A. Yes.

Q. And this one reads, "On Thursday, June 8, 2023, I followed up with an e-mail of Irish Johnson and Ronald Sampson, Sr. with the Indianola Police Department about obtaining a copy of Gregory Capers' report from the May 20, 2023 critical incident at 1111 B.B. King Road, Indianola, Mississippi when Capers shot [redacted] Ms. Johnson and Sampson replied that Capers did not write a report." Did I read that correctly?

A. Appears so.

Q. Now, this answers the same question. Do you have any additional information about any reason given by the Indianola Police Department for why there was no report?

A. No, I do not.

Q. Is this report by Mr. Moore accurate as to his communications?

A. Yes.

Q. So then going to pdf page 60, there's a report by Chadwick Moore, supplement number 32, and it states, "On Thursday, July 6, 2023, Ozie Carter with the Indianola Police Department gave me a copy of Gregory Capers' report from the May 20, 2023 critical incident at 1111 B.B. King Road, Indianola, Mississippi when Capers shot [redacted] Carter advised Capers' report was written on May 20, 2023, and he had the statement since it was written.

Carter explained he had yet to give the written statement to anybody, but had mentioned it to IPD Chief Ronald Sampson, Sr. Capers added his supplement to the eForce incident report number 2023050108 on June 13, 2023, a copy of Capers' written statement and the updated eForce incident report number 2023050108 have been uploaded to ADSI." Did I read that

correctly?

A. It appears so.

Q. Okay. And do you know -- and I have the same question, are you aware of any explanation for why the report written for Capers on May 20, 2023 hadn't been given to the MBI until July 6, 2023?

A. I am not.

Q. And is Mr. Moore's report written here accurate?

A. I believe so, yes.

Q. And it -- and did the MBI ever figure out why on multiple interactions in the past the Department had said they didn't have a report and then later on July 6, 2023, a report written the day of the shooting was produced to you?

A. According to this report, it was not turned over by Carter.

Q. Did you ever find out why Carter said he had mentioned the report to Chief Ronald Sampson, Sr. but Chief Ronald Sampson, Sr. had said that he wasn't aware of any report?

A. No.

Q. And did -- to your knowledge, did the MBI conduct any investigation into that question?

A. No.

Q. Going to page 83, which is DEF2901, there is a report dated May 20, 2023, describing the shooting and the response to the domestic disturbance call and signed by Gregory Capers. Do you see that there?

A. Yes.

Q. Is that the report that Ozie Carter gave to the MBI referenced in Chadwick Moore's report that we just reviewed?

A. I believe so, yes.

MR. HILKE: And then I'll mark Exhibit 5.

(Exhibit No. 5 was marked.)

BY MR. HILKE:

Q. This was also produced in connection with the subpoena. This is DEF3106 through 3109.

A. Yes.

Q. This is an Indianola Police Department report, incident report number 2023050108. Roll down to page 3 of the report. There is a supplemental narrative written by Gregory Capers on June 13, 2023. Do you see that?

A. Yes.

Q. And if we look back at Exhibit 2 on page 60, it describes an updated eForce incident report with the same number that was collected by Chadwick Moore after he spoke with Ozie Carter. Do you see that?

A. Yes.

Q. And is this Exhibit 5, the updated incident report with the supplemental narrative by Gregory Capers, is that the updated incident report that was provided to Moore after he spoke with Lieutenant Carter?

A. It appears to be the same.

Q. And did the MBI ever get an explanation for why Gregory Capers wrote a supplemental narrative on June 13, 2023 a little more than three weeks after the shooting?

A. No. It had no bearing upon the shooting.

Q. Okay. Then after the MBI investigation was completed, did the investigation team have communications with the Attorney General's Office?

A. Yes.

Q. And did the investigators discuss the case with the Attorney General's Office?

A. They asked questions and I was able to provide answers.

Q. Okay. And what was the nature of that discussion?

A. Just looking over the report and we went to a grand jury.

Q. Were there any like particular documents, particular evidence, particular issues that the Attorney

General's Office asked about?

A. I can't recall.

Q. And can you give me a sense, if you remember, of the nature of the questions? Meaning was -- if there was any topic of -- any -- are there any topics at all that you recall about the conversation with the Attorney General?

A. If I'd remember we would discuss the shooting and that was.

Q. Any further details about the discussion of the shooting that you remember?

A. No.

Q. Okay. And then -- and were you the -- as the lead investigator, were you the person having those conversations with the Attorney General's Office?

A. Yes.

Q. And then can you tell me what you recall from grand -- the subsequent grand jury proceedings?

A. We went to the grand jury, I gave my testimony and then they said they didn't -- they did not true bill it.

REPORTER: I'm sorry, they didn't what?

WITNESS: They did not true bill it.

REPORTER: True bill it. Thank you.

BY MR. HILKE:

Q. And what was the nature of your testimony during the grand jury proceedings and what did you discuss?

A. My report.

Q. Okay. So was it presenting the information that was given to you and the investigators during the investigation?

A. Yes.

Q. Was it summarizing the evidence that had been collected?

A. Yes.

Q. Did it include any recommendations?

A. No, not from me, no.

Q. Did it include any opinion testimony?

A. No.

Q. Anything else in particular that stands out to you from your grand jury testimony?

A. No.

Q. And following the grand jury proceedings, after the no true bill -- after no true bill was returned, did the MBI have any further communications about the investigation?

A. With who?

Q. With anyone. Was there any further shooting investigation?

A. Not that I'm aware of.

Q. In this case?

A. No more investigations. No.

Q. All right. Did the MBI have any communication with the Indianola Police Department after the grand jury proceedings?

A. As far as investigations, no.

Q. Oh, yeah, I'm sorry. That question was too broad. I meant to ask only about the investigation into the shooting of [redacted] by Greg Capers. Did the MBI communicate further about that shooting or that investigation after the grand jury with the Indianola Police Department?

A. Not that I'm aware of.

Q. Okay.

A. I know I did not.

Q. And to your knowledge, did the bureau of investigations communicate with the Mayor's office or the City of Indianola about the grand jury proceedings or the investigation after the grand jury proceedings completed?

A. Not to my knowledge.

MR. HILKE: Is everybody doing okay as far as breaks, et cetera? We've been going a little while. But I'm okay if everyone else is.

REPORTER: Can we take a break, Wally?

MR. HILKE: Yeah, of course.

REPORTER: Yeah, can we take ten?

MR. HILKE: That's all right with me.

MS. PRICE: Ten sounds good.

REPORTER: Okay. Thanks.

MR. HILKE: Thank you all. See you in ten.

(Off the record.)

BY MR. HILKE:

Q. We are back on the record.

I'm showing Exhibit 2 again. This is pdf page 85, DEF2903. Do you see on this page a criminal investigation warning?

A. Yes.

Q. And this was signed by Gregory Capers on May 20, 2023; is that correct?

A. Yes.

Q. And you were present for that interview with Mr. Capers on the day of the shooting; correct?

A. Yes.

Q. And is this a criminal investigation warning that Mr. Capers signed?

A. Yes.

Q. Taking you to page 118 of Exhibit 2, do you see here a crime scene findings by MBI crime scene

analyst Dywana Broughton?

A. Yes.

Q. And going down to DEF 2937, there's a Table of Contents. The next page section A, and the next page is a report of crime scene findings; is that correct?

A. Yes.

Q. And does this accurately report the crime scene findings from the -- crime scene findings by the MBI's crime scene analyst?

A. Yes.

Q. And are these photographs an accurate representation of the crime scene at the time the photographs were taken?

A. Yes.

Q. I asked you some questions earlier about MBI's practices and officer-involved shootings generally, but I now want to ask them specifically about the investigation into the shooting of [redacted] by Gregory Capers on May 20, 2023. Did the MBI evaluate in its investigation whether Gregory Capers complied with Indianola Police Department policy?

A. We didn't evaluate it, no. We added it to the report for the Attorney General's Office in order to have our report be complete, but we did not use their policy as -- for investigating criminal activity.

Q. Okay. Did the MBI draw any conclusions itself about whether Gregory Capers' shooting of [redacted] was justified?

A. We did not.

Q. Okay. Did MBI exonerate or clear Capers in the shooting in any way in the -- in its own conclusions in the course of the investigation?

A. No.

Q. Did the MBI ever communicate to the City of Indianola whether there were findings of wrongdoing in its shooting investigation?

A. Personally, I did not. If anyone else did, I don't believe. So I'm not privy to those conversations.

Q. Sitting here today, you're not aware of any MBI communications about whether there was wrongdoing in the shooting investigation; is that correct?

A. Again, all agents know that we don't make that determination.

Q. Okay. Are you aware of any communications from Commissioner Tindell about the results or findings of the shooting investigation?

A. No.

MR. HILKE: And I'm going to mark Exhibit 6.

(Exhibit No. 6 was marked.)

BY MR. HILKE:

Q. Exhibit 6 is DEF7181 through 7183. And these documents were produced to us by the defendants, not by the Mississippi Bureau of Investigation. So you may be viewing this for the first time. Does that make sense?

A. Yes.

Q. Okay. Page 1, DEF7181, is an e-mail from Chadwick Moore to Ronald Sampson and Irish Johnson dated June 8, 2023. Do you see that?

A. Yes.

Q. And it reads, "Afternoon, I wanted to follow up on the conversation Lieutenant Irish Johnson and I had yesterday. It was reported that the Indianola Police Department does not have use of eForce reports for Gregory Capers from the May 20, 2023 or the December 30, 2022 incidents, and there is not a written report from Capers for the May 20, 2023 incident. If this changes, please inform MBI so we can obtain copies of these documents for our records. Please reach out if you have any questions on the matter." Did I read that correctly?

A. It appears so.

Q. All right. And does this -- is this consistent with what we looked at in Mr. Moore's report earlier that he said he reached out to Ronald Sampson and Irish Johnson to confirm whether any written report

existed?

A. Yes.

Q. And in terms of any -- whether there was any further or additional e-mail correspondence, is that something that Chadwick Moore would need to search his e-mails to determine whether or not those e-mails exist?

A. Yes.

Q. And to your knowledge, does Mr. Moore still work with the Mississippi Bureau of Investigations?

A. He does.

Q. All right. And then scrolling down to page 3 of the pdf, this is DEF 7183. This was produced to us by defendants as a text message from Ronald Sampson, Sr., the police chief's phone to Chad. And it reads -- it's dated December 12th, 2023 at 1:15 p.m. Do you see that on your phone -- on your screen?

A. Yes.

Q. And starting with the sender's message here, it says, "Sender, Chad, will that be presented in Sunflower County? Respondent, yes, sir. The AG's Office will be presenting it. Sender, okay, great. Are they aware that the FBI findings? Respondent, I don't know what FBI findings you're referring to. Sender, they're not pursuing any charges nor found any civil rights violations." Did I read that correctly?

A. It appears so.

Q. All right. And am I -- is it correct that to whether Chadwick Moore had any other texts related to the case with Ronald Sampson, Sr., he would need to search his own phone for those?

A. Yes.

Q. And there's a reference in this message that was produced to us about FBI findings. Did the MBI receive any information from the FBI or information about any other investigations regarding the shooting of [redacted]

A. Not that I'm aware of.

Q. Okay. What about like the Department of Justice? Is there any, you know, parallel investigation at all that the MBI was aware of?

A. I was not contacted by FBI or DOJ, so I'm not aware of any.

Q. And no such investigation is mentioned in the case file; is that correct?

A. That's correct.

Q. All right. Okay. Just one moment, please.

All right. Sir, before we finish are there any other documents from the investigation that you'd like me to show you or you would like to review to refresh your memory?

A. No.

Q. Are there any answers from your testimony today that you need to correct or clarify?

A. Not that I believe.

Q. All right. And are there any further conversations with Chief Ronald Sampson or any of the leaders of the Indianola Police Department that occurred during the investigation that I haven't asked you about?

A. Not that I know of.

Q. All right.

MR. HILKE: Just one last second.

All right. Sir, those are all my questions for now. Ms. Price may have some questions for you or Mr. Keeton, and if they do, I may have some follow-up questions after them. But I truly appreciate your time today, and I'll now pass the witness.

MS. PRICE: Would you all mind taking about a five-minute break? I don't think I have any further questions. I just want to take five minutes and make certain.

REPORTER: Okay.

MR. HILKE: That's fine with me.

MS. PRICE: Okay.

(Off the record.)

MS. PRICE: We have no further questions.

Thank you, Mr. Sanders, for your time today. That concludes the deposition.

WITNESS: Thank you.

REPORTER: Okay. Any questions, Mr. Keeton?

MR. KEETON: I have no questions for Mr. Sanders.

REPORTER: Okay. And, Wally, are you ordering?

MR. HILKE: Yes.

REPORTER: Okay. And would you like me to just send you a rough a draft and then the final in ten business days?

MR. HILKE: We would like the least expensive option for a pdf copy.

REPORTER: That's okay. Do you need it quicker than ten business days?

MR. HILKE: No, I do not.

REPORTER: Oh, you don't. Okay. So my advice is if that's the request, is just to get normal turnaround, which is final.

MR. HILKE: That will fine. Thank you.

REPORTER: Okay. And then, Mckenzie, same for you?

MS. PRICE: Yes, please. Thank you.

REPORTER: Oh, you're welcome. And do you

need a rough draft or no?

MS. PRICE: No rough draft.

REPORTER: Okay. And, Brady, same for you? Copy for you, Brady?

MR. KEETON: Yes, just a copy.

REPORTER: You got it. No rough draft?

MR. KEETON: No rough draft.

REPORTER: Okay. And turnaround's okay for you, Mckenzie?

MS. PRICE: Yes, ten days is perfect.

REPORTER: Okay. And, Brady, same for you?

MR. KEETON: Okay.

REPORTER: That's okay? Okay. Good.

(The deposition of Bradley Sanders was concluded at 9:09 a.m.)

(Signature was reserved.)

STATE OF WASHINGTON )
) SS.
COUNTY OF KING )

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this ______ day of ____________ 2026 at ____________, _______________.

________________________________

BRADLEY SANDERS

C E R T I F I C A T E

STATE OF WASHINGTON )
)SS.
COUNTY OF KING )

I, Judith A. Robinson, Certified Court Reporter and an officer of the Court under my commission as a Notary Public, in and for the State of Washington, do hereby certify that the foregoing deposition was transcribed under my direction; that the transcript of the deposition is a full, true and correct transcript to the best of my ability; that I am neither attorney for, nor a relative or employee of any of the parties to the action or any attorney or Counsel employed by the parties hereto, nor financially interested in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 22nd day of April, 2026.

Judy Robinson

Judith A. Robinson, Notary Public
in and for the State of Washington
residing at Seattle.
My Commission expires November 4, 2028.
CCR License #2171

ERRATA SHEET
CHANGES IN TESTIMONY
Nakala Murry ex rel. A.M., et al. v City of Indianola, et al.
BRADLEY SANDERS - 30(b)(6)
April 14, 2026

Page Line From To

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

SIGNATURE:_______________________DATE:___________

BRADLEY SANDERS - 30(b)(6)

[redacted]