**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**A.M., by and through next friend,**
**Nakala Murry, NAKALA MURRY**                                   **PLAINTIFFS**

**VS.**                                                   **CAUSE NO. 4:25-cv-53-JDM-DAS**

**CITY OF INDIANOLA, ET AL.**                             **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**
**GRANTING SUMMARY JUDGMENT**

This case centers on a domestic disturbance call that sadly resulted in a child being shot by a responding officer.

Objectively, there is no dispute over what happened at Nikala Murry's house in the early hours of May 20, 2023. Officer Greg Capers turned on his body camera while he and his partner responded to Murry's house. And from this video recording, one can see the events unfold in real time from Capers's first-person perspective.

What the video shows is Officer Capers and his partner arriving at Murry's blacked-out house at approximately 4:45 a.m. while it was still dark. Capers knocks loudly and repeatedly over a two-minute span. But no one answers the door. Officer Capers is heard saying, "something ain't right," as he walks around the house's perimeter. Capers radios to dispatch. And from the video, it appears dispatch is on the phone with Murry herself, who conveys that she is in the house and can hear the police. But she cannot not come to the door because the suspect—her ex-boyfriend John Nolden—refuses to let her. Dispatch tells Officer Capers that she does not think any weapons are present and that Murry had given the officers permission to kick in the front door.

After several failed kicks, Murry screams and then heads out the front door. Visibly frightened, she nods towards the house indicating the suspect Nolden is inside. When asked if he

had any weapons, she utters "un-uh." And when asked where Nolden was, she said he was in the back.

The video shows the inside of the house is pitch black. The only light is from Officer Capers's flashlight. Capers yells a couple of times, commanding Nolden to come out. And Officer Capers announces "police" and warns "don't make us come in." But Nolden does not budge. So Capers takes one step inside the dark house, gun drawn. And the second he does, a blurred figure runs straight at him. Instantaneously, Officer Capers discharges his weapon.

The individual kept running outside. And a shocked Capers quickly realized the injured person was not Nolden, who was still hiding in the house—it was Murry's eleven-year-old son A.M. He had been shot in the upper chest. Capers immediately went to A.M. and began rendering aid.[1]

That is what the video shows. Where Murry[2] parts ways with Officer Capers and his employer, the City of Indianola, is how she *interprets* the events depicted in the video. In Murry's view, Capers unreasonably and intentionally shot A.M., an unarmed child, who was complying with the command to come out with his hands up. Murry argues Capers knew—or should have known—he was shooting at A.M. and not Nolden.

But from the video, no reasonable fact-finder could conclude Capers acted unreasonably or with reckless disregard, let alone intentionally shot A.M. Instead, an objective viewing shows two things. Capers made a split-second assessment, in a dark house, about the threat posed by the charging figure, during the stress of a domestic disturbance call. And Capers's use of force was reasonable, though in hindsight the perceived threat turned out to be A.M.

---

[1] Emergency medical services arrived and transported A.M. to the hospital where he recovered.
[2] Murry sued the City of Indianola and Officer Capers on both A.M.'s and her behalf, alleging federal constitutional violations and a state-law claim.

This means what happened that night, while tragic, is not actionable.

That's because the law affords police officers and governmental entities they serve certain immunities from lawsuit based on police activity. Under federal law, qualified immunity shields police officers from trial unless the facts show the officer's conduct violated a clearly established constitutional right.[3] And when an officer acts reasonably, but mistakenly about the existence of exigent circumstances, he has not violated the Constitution.[4] Similarly, Mississippi law affords immunity against claims arising out of police-protection activity unless the officer acted in reckless disregard to the safety of those not engaged in criminal activity.[5] Reckless disregard is a high standard—higher than negligence and even gross negligence. And it "usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow."[6]

Here, there is no question both immunities apply. While Officer Capers in hindsight was mistaken about who charged toward him and why, the video shows his response was reasonable under the circumstances. And the video flatly contradicts Murry's claim that Capers had almost a willingness to harm her son.

For these reasons, the City and Capers's motions for summary judgment [113, 121]—asserting both qualified immunity for Murry's § 1983 claim and law-enforcement immunity for Murry's state-law tort claim—are **GRANTED**. Summary judgment is also granted in the City's favor on Murry's claim that official city policies and actions violated A.M.'s constitutional rights. Judgment shall be entered in the City and Capers's favor on all of Murry's claims.

---

[3] *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).
[4] *Id.* at 205-06.
[5] Miss. Code Ann. § 11-46-9(1)(c).
[6] *Maye v. Pearl River Cnty.*, 758 So. 2d 391, 394 (Miss. 1999).

3

**Summary Judgment Standard**

The main thrust of both summary judgment motions is immunity—qualified immunity from Murry's § 1983 claim and police-protection immunity against her state-law tort claim.

While both the United States Supreme Court and Mississippi Supreme Court have encouraged immunity rulings be made as early in litigation as possible,[7] Murry's claims on behalf of her son A.M. and herself have taken a circuitous route through both federal and state court.

The shooting happened on May 20, 2023. And Murry immediately filed suit in this Court on May 30, 2023. But after two years of litigation that stalled out in the pleadings stage, this Court dismissed her action without prejudice. *Murry v. City of Indianola*, No. 4:23-cv-97-DMB-DAS (N.D. Miss. Apr. 3, 2025). So Murry filed this action a month later on May 6, 2025, asserting federal claims only. Meanwhile, Murry also pursued a separate state-court action. But in January 2026, after the City and Capers moved for summary judgment, Murry moved to amend her complaint to add her state-law claim. [79] The Court granted the request, mooting the summary judgment motion. [105]

Murry filed her amended complaint on March 15, 2026. The City and Officer Capers first responded by filing a summary-judgment motion aimed at the newly added state-law claim. [113] Among other things, they asserted police-protection immunity from suit. The City and Capers next renewed their original summary-judgment motion aimed at Murry's federal claims. [121] They asserted both qualified immunity for Officer Capers and failure to state a § 1983 claim against

---

[7] *Saucier*, 533 U.S. at 200; *Miss. Transp. Comm'n v. Adams ex rel Adams*, 197 So. 3d 406, 411 (Miss. 2016).

the City.  Briefing on both motions concluded in early June 2026.[8]  So more than three years after Murry first filed suit, the immunity issues are finally ripe for ruling.[9]

Rule 56 directs summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The Court must view the evidence in the light most favorable to the non-movant.  *Baker v. Cobon*, 170 F.4th 988, 992 (5th Cir. 2026).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  But once that burden is met, the nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324.

---

[8] On June 1, 2026, the City and Capers submitted their reply brief, supporting their summary-judgment motion focused on the two § 1983 claims. [161]  Minutes before submitting the reply brief, they moved for permission to exceed the 35-page limit set by Local Rule 7(b)(5). [160]  The motion was candid that, while Murry's counsel did not outright object, Murry's counsel had conditioned their consent on the express view that it would only be fair if they were given extra pages too via sur-reply.  *But see Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 751 n.2 (5th Cir. 2014) (per curiam) (explaining sur-replies are "heavily disfavored by courts").  Before this Court could consider the motion, which it deems opposed, the City and Capers filed the reply brief containing the eleven extra pages.  But this Court finds no extra pages are necessary.  Before the City and Capers filed their June 1 reply, both parties had thoroughly briefed the issues.  So the motion for permission to exceed the page limit [160] is denied.  And to the extent the City and Capers' reply brief exceeded the page limit, the Court did not consider the arguments in those pages.

[9] This winding procedural history figures prominently into this Court's decision to exercise supplemental jurisdiction over Murry's state-law claim, though it finds Murry's federal-law claims must be dismissed.  *See Est. of Parker v. Miss. Dep't of Pub. Safety*, 728 F. Supp. 3d 372, 392 (S.D. Miss. 2024) (citing 28 U.S.C. § 1367(c)).  After three years, the police-protection immunity question—which should be resolved as early in the litigation as possible—is finally teed up for a judicial determination.  And the Court finds no good reason for further delay.  Murry chose to add the state law claim to this case, instead of the separate state-court action.  So the state-law claim is in Murry's preferred jurisdiction.  Further, the state-law claim is based on the same event as the federal claim.  And Murry presents almost the exact evidence and arguments against police-protection immunity as she does to oppose qualified immunity.

But "[a] qualified immunity defense alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)). Once an official like Capers pleads qualified immunity, the burden shifts to the plaintiff. *Id.* While the plaintiff retains the advantage of all inferences being drawn in her favor, the plaintiff must rebut the qualified immunity defense. *Bailey v. Ramos*, 125 F.4th 667, 674 (5th Cir. 2025). The way Murry must do this is by establishing a genuine fact issue as to whether the official violated a statutory or constitutional right that was clearly established at the time of the conduct. *Id.*

Similarly, under Mississippi law, when facing summary judgment based on police-protection immunity, the plaintiff bears the burden of producing sufficient evidence that the police officer acted with reckless disregard. *Berry v. Jackson Cnty.*, 397 So. 3d 911, 919 (Miss. Ct. App. 2024).

"There is one further wrinkle." *Bailey*, 125 F.4th at 674. And that is where, as here, "video evidence is available." *Id.* When there is video evidence, the Court must "view the facts in the light depicted by the videotape." *Boyd v. McNamara*, 74 F.4th 662, 665 (5th Cir. 2023) (quoting *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022)). This means, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the [video], so that no reasonable jury could believe it," a court should not adopt the non-movant's version of the facts when ruling on a motion for summary judgment. *Bailey*, 125 F.4th at 675 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (noting that, at the summary judgment stage, "a court should not discount the nonmoving party's story *unless the video evidence provides so much clarity that a reasonable jury could not believe [the nonmovant's] account*." (emphasis added)). Instead, the Court "assign[s] greater weight, even at

6

the summary judgment stage, to the facts evident from video recordings taken at the scene." *Bailey*, 125 F.4th at 675 (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).

## Discussion

Murry's theory of what happened—that Capers knew or should have known it was her unarmed eleven-year-old son running at him—is "blatantly contradicted" by Capers's body-camera video. *Scott*, 550 U.S. at 380. So, in short, no reasonable jury could believe her version of events. *See id.* Thus, Murry cannot meet her burden to overcome Capers's qualified immunity. Nor can she meet her burden to establish any question that police-protection immunity does not apply.

### I.      Qualified Immunity

The amended complaint's Count I seeks money damages under 42 U.S.C. § 1983. The cited basis for damages is Officer Capers's alleged violation of both A.M.'s and Murry's constitutional rights. Murry suggested Capers's having his gun drawn when she fled the house and his telling her to go stand by his partner, Officer Webb, was a temporary seizure, violating her Fourth Amendment rights. But she does not contest that Officer Capers is entitled to summary judgment on her personal Fourth Amendment claim. *Cf. Bailey v. U.S.*, 568 U.S. 186, 194-95 (2013) (acknowledging temporary detentions while securing the scene are reasonable). Instead, her focus is on A.M.'s Fourth Amendment excessive-force claim.

Because Capers asserts qualified immunity, Murry has the burden to rebut the qualified immunity defense. And she must do so by establishing a genuine fact issue as to whether the official violated a statutory or constitutional right that was clearly established at the time of the conduct. *Bailey*, 125 F.4th at 674. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what

7

he is doing is unlawful." *Lincoln v. Scott*, 887 F.3d 190, 195 (5th Cir. 2018) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Wesby*, 583 U.S. at 63 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. So for there to be a Fourth Amendment violation, there must not only be a seizure, but that seizure must also be unreasonable.

Officer Capers asserts there was no seizure because he did not intentionally shoot A.M. As support, he draws on the Supreme Court's definition of a Fourth Amendment seizure—"a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989). Capers cites "innocent bystander" or hostage cases that have held no seizure occurred when a bullet hits a bystander or hostage because the officer's use of force was not deliberately applied to the bystander or hostage. *See*, *e.g.*, *Blair v. City of Dallas*, 666 F. App'x 337, 341-42 (5th Cir. 2016) (collecting cases). But the Fifth Circuit recently acknowledged our circuit has not "definitively resolved whether a seizure occurs when law enforcement intentionally targets a suspect but unintentionally strikes an innocent hostage." *Est. of Parker v. Miss. Dep't of Pub. Safety*, 140 F.4th 226, 238-39 (5th Cir. 2025).

Murry counters that this is not a situation where Officer Capers intended to shoot someone else but shot A.M. in the process. Instead, she contends Capers intended to shoot the person running toward him. So she argues there was a seizure. And indeed, there appears to be another line of "mistaken identity" cases that have found a seizure occurs when an officer intentionally shoots his firearm with an objective intent to restrain, even when he is mistaken about the identity

8

of the person restrained. *Kilnapp v. City of Cleveland, Ohio*, 167 F.4th 909, 925-26 (6th Cir. 2026); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 796 (1st Cir. 1990).

But here, the Court need not bog itself down answering the seizure question by asking whether A.M. was the intentional target or innocent bystander. Rather, as in *Estate of Parker*, for today's purposes, the Court assumes that a seizure occurred. 140 F.4th at 239. So the Court's focus is instead on whether Capers's use of force was reasonable. *See id.* As the Sixth Circuit recently reiterated, "the fact of a seizure does not alone establish a Fourth Amendment violation— the seizure must be *unreasonable*." *Kilnapp*, 167 F.4th at 927. And "there will be many cases in which an unintended target shot by police is seized, but the officer's use of force was objectively reasonable and thus did not violate the individual's Fourth Amendment rights." *Id.*

The Fifth Circuit has explained the "[u]se of deadly force is not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others." *Carnaby*, 636 F.3d at 188 (citation omitted) (holding officers' use of deadly force was objectively reasonable based on belief the deceased "was about to bring a firearm to bear on them" even though, in hindsight the deceased did not appear to be reaching for a gun).

Here, Officer Capers's body camera shows his use of force was objectively reasonable under the circumstances. Capers and Webb were responding to more than one late night 911 call from Murry seeking emergency help. And the officers understood Murry was in physical danger from her ex-boyfriend. The Fifth Circuit has recognized stressful circumstances like "domestic disputes often involve high emotions and *can quickly escalate to violence*." *U.S. v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010) (emphasis added). This is true even when "the situation was seemingly calm at [the officers'] arrival[.]" *Id.*

But here the situation was not calm when officers arrived.

9

The dispatcher conveyed that Murry was being held against her will. And when officers approached the house, they observed the windows were covered. As Webb later told investigators, this prompted the two to take "precaution." They kept their firearms in hand at the ready, because they could not see if the ex-boyfriend was pointing a weapon at them. Their repeated loud knocks over a two-minute period went unanswered. And it wasn't until Officer Capers began kicking in the door that Murry finally opened it. She was visibly shaken as she headed out. Officer Capers announced "police" and warned against making him have to enter the home. Neither the suspect nor anyone else responded. The house was completely dark when Officer Capers stepped in and shined his flashlight. The only person Capers believed was inside the house was Nolden. So when a figure ran toward him, Officer Capers reasonably—though mistakenly—perceived a threat to his, his partner's, and Murry's life. As the Supreme Court has acknowledged, "officers can have reasonable, but mistaken, beliefs as to the facts establishing . . . exigent circumstances." *Saucier*, 533 U.S. at 206. And "qualified immunity can apply in the event the mistaken belief was reasonable." *Id.*

Murry argues a fact question exists about whether Capers acted unreasonably. She argues Murry knew she had children. So he should have known they were there that night. She also points to evidence that suggests A.M. and not Murry had called 911. And she asserts that Capers should have distinguished her shorter son from her six-foot-tall ex-boyfriend. Her most adamant claim is that, based on the evidence, Capers had no reason to fear that Nolden was armed inside the house. Dispatch conveyed there didn't appear to be any weapons involved. And Murry herself answered in the negative when Capers asked if Nolden was armed.

But according to Officer Capers and Webb, they had no idea anyone besides Nolden was in the house. The video shows dispatch on the phone with Murry. And there is no evidence the

10

dispatcher mentioned children to the officers. Further, Murry did not tell Capers her children were inside when she crept out. Still, even if Officer Capers had reason to suspect children were there, it does not negate the reasonableness of his reaction to someone charging toward him. *Cf. Estate of Parker*, 140 F.4th at 241-42 (finding it was not unreasonable for officers to fire at a dangerous shooter though they knew the shooter's infant son was in his lap, who was killed in the cross-fire).

As to Murry's claim that Capers knew or should have known it was A.M., and not Nolden, running at him, the video completely contradicts this. It shows Officer Capers had no time to analyze the threat posed. And the Court cannot play Monday morning quarterback to critique the reasonableness of Capers's action in real time. Instead, "the law requires [courts] to assess reasonableness from the vantage of a reasonable officer on the scene—not with the clarity of 20/20 hindsight." *Id.* at 241.

Finally, Murry claims Capers had no reason to believe Nolden had a gun. But it is certainly not unreasonable for an experienced officer like Capers to assume when he encounters a late-night domestic dispute in a home—particularly where a woman is being held hostage—that there is a strong possibility of firearms inside. And indeed, investigators *did* recover a gun from Murry's bedroom—a gun Nolden confirmed he knew about. So Officers Capers's in-the-moment concern about a weapon was not off-base.

Undeniably, what happened to A.M. that night was terrible. But as the Fifth Circuit has stressed, courts "cannot second-guess [officer] decisions after the fact—from the remove and repose of our chambers." *Id.* at 242. Caper's "use of force, while tragic in consequence, was not excessive" under the circumstances and under our law. *Id.*

Because Murry has not established Capers violated A.M.'s Fourth Amendment right, the Court need not address whether the right was clearly established at the time of the shooting.

11

Officer Capers is entitled to qualified immunity, and thus summary judgment in his favor, as to Count I.

## II.     Police-Protection Immunity

Turning to Count III, Murry's recently added state-law claim against the City,[10] the amended complaint titles this count "Mississippi Tort Claims Act Claim," citing Mississippi Code Section 11-46-11.  This Court shares some of the City's concerns about Count III and whether it alleges a tort claim.[11]  But assuming it does, the City is still immune from liability based on police-protection immunity.  Miss. Code Ann. § 11-46-9(1)(c).

"[I]mmunity is a question of law and is a proper matter for summary judgment." *Mitchell v. City of Greenville*, 846 So. 2d 1028, 1029 (Miss. 2003).  Through the MTCA, the Mississippi "Legislature waived 'the immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment[.]'" *Wilcher*, 243 So. 3d at 182

---

[10] Unlike a § 1983 claim, under the MTCA, an employee acting within the course and scope of his employment cannot be held individually liable.  Miss. Code Ann. § 11-46-7(2).  So Count III is solely aimed at the City, based on Capers's actions that Murry contends were within the course and scope of his City employment.

[11] The Mississippi Supreme Court has been clear—the Mississippi Tort Claims Act (MTCA) does not create duties for which a governmental entity can be liable for breaching.  *Wilcher v. Lincoln Cnty. Bd. of Supervisors*, 243 So. 3d 177, 184 (Miss. 2018).  Instead, the MTCA is about sovereign immunity—when it applies and when it is waived.  *Id.*  So labeling a count "Mississippi Tort Claims Act Claim" does not identify any particular tort or theory of liability.  Instead, it is simply shorthand for describing a tort claim for which sovereign immunity has allegedly been waived. But that still leaves the question about what tort theory is being alleged.  In her response, Murry suggests Count III encompasses no less than five different tort theories.  At the summary judgment stage, the Court need not delve into all five theories and whether they can actually be found in Count III.  At a minimum, Count III appears to present a negligence claim.  So the Court will proceed to address the City's police-protection immunity claim.  But the Court also cautions plaintiffs against the dangers of simply alleging a "MTCA claim" or "MTCA violation."  The better course is to allege the specific underlying tort claim or claims for which the plaintiff seeks recovery, while also alleging why sovereign immunity has been waived under the MTCA.

(Miss. 2018) (quoting Miss. Code Ann. § 11-46-5 (Rev. 2012)). So in Mississippi, "the default rule is that political subdivisions like [the City of Indianola] are not immune from tort claims." *Id.*

But—and this is a very important but—"the Legislature carved out several exceptions, reinstating immunity for certain types of claims." *Id.* (citing Miss. Code Ann. § 11-46-9(1)). And relevant to this case is the reinstatement of immunity for claims "[a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection *unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury*[.]"[12] Miss. Code Ann. § 11-46-9(1)(c) (emphasis added).

No one has come close to suggesting A.M. was engaged in criminal activity. But that does not lessen the "extremely high bar" the Mississippi Legislature has set for plaintiffs like Murry "seeking to recover against a city for a police officer's conduct while engaged in the performance of his or her duties." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (Miss. 2023) (quoting *City of Jackson v. Presley*, 40 So. 3d 520, 523 (Miss. 2010)). As the Mississippi Supreme Court has explained, "[p]olice officers and fire fighters are more likely to be exposed to dangerous situations and to liability." *Id.* "'[T]herefore, public policy requires that they not be liable for mere negligence[,]' but for 'reckless acts only.'" *Id.* at 323-24 (quoting *Maldonado v. Kelly*, 768 So. 2d 906, 909 (Miss. 2000)) (second alteration in original).

And that is what this case comes down to. The Court points out that, based on the other evidence Murry presents, there is arguably a factual dispute to support a triable claim that Officer Capers was *negligent*. For example, Murry cites Capers's deposition testimony where he

---

[12] The City alternatively argues it is entitled to "discretionary immunity" under Mississippi Code Section 11-46-9(1)(d). But since this Court finds police-protection immunity applies, it does not address this alternative claim.

acknowledged he knew Murry had children from past interactions with Murry while on patrol. Murry also points to the elementary-school sign and scooter in her yard. From this, she deduces that Capers *should have known* children were in the house on May 20, 2023. She suggests this even though the dispatcher did not tell Officers Capers and Webb that others were inside. And Murry herself made no mention about her own children when leaving. Similarly, Murry relies on Capers's deposition testimony acknowledging other domestic-disturbance-response protocols he could have followed but did not. So if the standard to survive summary judgment was negligence, Murry's state-law claim might proceed.

But Mississippi law imposes a "higher standard" than negligence—or even "gross negligence"—for claims based on police-protection activity. *Id.* at 324. For purposes of Section 11-46-9(1)(c), reckless disregard "embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Id.* The Mississippi Supreme Court has emphasized, in contrast to negligence, which "is a failure to exercise due care," wantonness is a "failure or refusal to exercise *any* care." *Id.* (quoting *Maldonado*, 768 So. 2d at 911). Stated differently, "[r]eckless disregard usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow." *City of Clinton v. Tornes*, 252 So. 3d 34, 38 (Miss. 2018). Moreover, reckless-disregard analysis, just like excessive-force analysis, is an "objective standard" that considers "all the factors [an officer is] confronted with" and "tak[es] into account the fact that the officer[] must make split-second decisions." *Phillips*, 368 So. 3d at 324 (quoting *City of Jackson v. Gardner*, 108 So. 3d 927, 979 (Miss. 2013)).

There is no evidence that Officer Capers was *consciously* indifferent to the fact he could have accidentally shot a child. Nor is there evidence he entered Murry's house with a willingness that harm to A.M. should follow. To reiterate, the undisputed facts show Officers Capers and

Webb were responding to not one but two separate 911 calls. And these emergency calls specified that Murry was in danger from her ex-boyfriend. Again, "domestic disputes often involve high emotions and can quickly escalate to violence[.]" *Rodriguez*, 601 F.3d at 408.

When Murry finally emerged from the home, she looked terrified and communicated only in monosyllables and head nods. And just as Capers had barely crossed the threshold into the dark house, someone ran from the shadows towards him.[13] Capers made a split-second decision to discharge his firearm to protect himself, his fellow officer, and Murry. In 20/20 hindsight, one might dissect the ways Capers could have exercised better care. But the evidence contradicts the notion that he failed to exercise *any* care.

Because Murry cannot show Capers acted with reckless disregard, police-protection immunity prohibits her from recovering tort damages against the City. The City is entitled to summary judgment on Count III.

### III.    No Municipal Liability

This leaves only Count II—Murry's § 1983 claim against the City. This claim is based on her suggestion that official City policies and actions violated A.M's constitutional rights. Murry's complaint alleged the City had interrelated policies that included the unconstitutional use of force. But in her response to the City's motion for summary judgment, Murry put forth an additional theory—that the City *ratified* Capers's unconstitutional use of force. The problem with this argument is that, without an underlying use of excessive force, there is no municipal liability.

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978), the Supreme Court held municipalities "can be sued directly under § 1983 for monetary,

---

[13] Nolden later told investigators that he was hiding in the hallway from police when A.M. moved past him. And Nolden's answers to questions about him seeing A.M. suggested that even Nolden had no time to process what was happening and intervene.

declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." But "[i]t is well settled that 'without a predicate constitutional violation, there can be no *Monell* liability.'" *Pipkins v. Stewart*, 105 F.4th 358, 360 (5th Cir. 2024) (quoting *Loftin v. City of Prentiss*, 33 F.4th 774, 783 (5th Cir. 2022)). This is because "municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell*, 436 U.S. at 694).

As discussed earlier, Murry cannot demonstrate a constitutional violation. So there can be no municipal liability. The City is entitled to summary judgment on Count II.

### Conclusion

The Motion for Summary Judgment [113] and Motion for Summary Judgment *Renewed* [121] are **GRANTED**.

The Motion for Leave to File Excess Pages [160] is **DENIED**.

With no remaining claims, this case is **CLOSED**. A separate final judgment shall follow.

**SO ORDERED** this the 18th day of June, 2026.

       /s/ James D. Maxwell, II
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI